Huguette Nicole Young (nee Pelletier), Ph.D., J.D., Pro se
23055 Sherman Way, #4802
Los Angeles, CA  91308
Phone: 415-948-8076
E-mail:  hn_young@yahoo.com

**F I L E D**
CLERK, U.S. DISTRICT COURT

3/9/22

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CS _____ DEPUTY

United States District Court

Central District of California

Western Division

HUGUETTE NICOLE YOUNG,

              *Plaintiff*,

v.

ERIC GARCETTI, in his official capacity
as Mayor of Los Angeles, California,

MIKE FEUER, in his official capacity as
Los Angeles City Attorney,

LOS ANGELES COUNTY BOARD OF
SUPERVISORS,

GEORGE GASCON, in his official capacity as
Los Angeles County District Attorney,

GAVIN NEWSOM, in his official capacity
as Governor of California,

ROB BONTA, in his official capacity
as Attorney General of California,

              *Defendants*.
_____

CASE NO. CV22-1602-MWF(PVCx)

VERIFIED COMPLAINT FOR
DECLARATORY AND EMERGENCY
INJUNCTIVE RELIEF

Plaintiff complains as follows:

Verified Complaint

1

## Introduction

1. This is a constitutional challenge to every Covid-19 related emergency order issued and/or enforced by defendants since early 2020. While the primary focus is on the most recent versions of the face-mask, social-distancing, testing, and vaccine mandates issued and/or enforced by each defendant since early 2020, the main argument is that the emergency that defendants have been relying on for these orders is currently not an emergency *nor has ever been established as an emergency at any time in the past* even on a short term basis.

2. The emergency injunctive relief requested here therefore applies to everything ordered under the umbrella of the various Covid-19 emergency declarations in the past and, more important, any orders defendants plan to issue or enforce in the future addressing the purported Covid-19 pandemic or any other false emergency.  This lawsuit does not become moot should defendants withdraw their fraudulently issued declarations and orders only to preserve their unconstitutional powers for another day.

3. Should this argument fail, a secondary line of argument is that defendants have not met even the lowest requirement – the rational basis test – for constitutionality for any of their orders even though the highest requirement – the strict scrutiny test  –  should apply. There is, and has always been, overwhelming scientific evidence these orders do far more harm than good to the public, especially when there are sinister motives by the government, as appears to be the case moreso by the day.

4. Finally, even if the orders can be shown to do more good than harm and pass the rational basis test, defendants are basing their arguments on a right of an individual to not be exposed to nature or to natural disasters, a right that does not exist even under the Ninth Amendment and is entirely unsustainable.  Plaintiff therefore claims that defendants' arguments based on a non-existent right must fail when balanced against the well-established fundamental rights these

orders are violating.

5.  The challenged orders and the corresponding constitutional violations are as follows:

-   Mask mandates violate plaintiff's First Amendment right to communicate a smile, plaintiff's Ninth Amendment right to breath air freely, and plaintiff's Ninth Amendment right to not be forced by the government to don any particular item on her body.

-   Social distancing mandates violate plaintiff's First Amendment right to assemble freely.

-   Vaccine mandates violate plaintiff's right to equal treatment under Article 1, Section 10, Clause 1 of the U.S. Constitution, which restricts state and local governments from passing bills of attainder punishing a targeted person or group of people for arbitrary, usually political, reasons.  Vaccine mandates also violate plaintiff's Ninth Amendment right to informed consent for any medical procedures, which includes both a vaccine shot and any test requiring that a sample be taken from plaintiff's body.

6.  In 2020 plaintiff filed 49 anti-mask mandate complaints in United States district courts covering 47 states and the District of Columbia (Attachment 1).  Nothing has changed in plaintiff's arguments since then. The only difference is all the mortality data plaintiff was demanding be made publicly available by defendants in order to put an end to the fraud has finally been made publicly available so that the fraud can now be ended, albeit almost two years later than it should have been (Young, H.N. "Covid-19's true death toll: millions less than official counts," submitted for publication and available here as Attachment 2).

7.  The (now) publicly available mortality data show everything plaintiff was claiming in her original lawsuits is true or likely true, namely:

-   That Covid-19 is less deadly than the flu

-   there has yet in the history of the world, including since 2020 with Covid-19, been a bacteria or virus that has been shown by anybody (other than buffoons who pretend to be scientists and the buffoons in the media who repeat them) to spread through the air simply from somebody breathing it in or out without coughing or sneezing,

-   mask mandates create unnecessary health risks to the public by causing greater spread of all kinds of viruses and bacteria, not just Covid-19, through contact with filthy virus-contaminated masks that people have coughed, sneezed, and leaked mucous into all day (when they should be coughing and sneezing into their arms and blowing their noses into tissues) while at the same time reducing much needed oxygen to the mask wearer,

- for any virus outbreak antibody tests are the safest, most informative, most accurate tests to be given to the public with least invasion of privacy rights,

- government scientists who should have known better even before 2020 and lawmakers who should have known better after receiving official notice of plaintiff's lawsuits (which means just about every lawmaker in the country by the end of 2020) are purposely skewing data to the public for sinister purposes – and all should be held *civilly and criminally liable* for any continued Covid-19-related emergency orders perpetuated after 2020, if not sooner; this includes the estimated millions to potentially tens of millions of unnecessary starvation deaths caused worldwide ("Six-fold increase in people suffering famine-like conditions since pandemic began" Oxfam International, July 9, 2021, https://www.oxfam.org/node/17024 ) as a result of defendants' ongoing promotion and perpetuation of a worldwide fraud in what plaintiff has termed #FakePandemicHolocaust on online social media sites since September, 2020 (https://tinyurl.com/2p8mdt8n).

8.   The only thing that has changed by defendants since plaintiff's prior lawsuits is that the failure of the United States court system to do its primary job of protecting plaintiff's rights emboldened the fraudsters to take greater unconstitutional actions causing even greater public harm for even bigger political and monetary profits with vaccine mandates.  Therefore, the claim by plaintiff that defendants should be held personally liable for knowingly perpetuating a dangerous fraud now extends to the entire generation of young California schoolgirls, especially those of Latino or Asian ethnicity, who are currently being targeted by California's most politically powerful, woman-hating closeted gay men like Eric Garcetti, Mike Feuer, Rob Bondi, and Xavier Baccerra, along with powerful closeted gay men in the pharmaceutical industry like Bill Gates of Microsoft fame, Albert Bourla, CEO of Pfizer, and Stephen Hoge, president of Moderna.  Young California public school girls are being targeted by these men for gender-transitioning drug trials (under the guise of mandated Covid-19 school vaccines) that will likely render the girls infertile for life.

9.   Let us all hope the court has grown in the right direction in the nearly two years since plaintiff's original lawsuits and does not dismiss this lawsuit because "it is acceptable for the

Verified Complaint

government to squash speech as long as the government treats everybody the same" or "it is

acceptable for the government to violate your rights as long as you are just passing through the

state" or "plaintiff does not cite any important sources of law (other than the U.S. Constitution) as

a basis for her arguments" or "the U.S. Supreme Court ruling that says you do not have to pay

filing fees if you swear under oath that you cannot afford them and also pay your bills has been

overturned by lower courts, and by the way, just because you live in a car and receive food

stamps does not mean you cannot afford to pay $25,000 in filing fees and another $25,000 in

service of process fees" or any other horrendous reasons for dismissal given to plaintiff in the

past, most likely issued by law school interns to unconstitutional magistrate judges that nobody

ever checks and that have been put in charge of what is supposed to be the most important

lawsuits protected under the U.S. Constitution: Pro se constitutional challenges.

## Jurisdiction and Venue

10. The court has federal subject matter jurisdiction over this action because it is a

constitutional challenge to state and local laws that violate several provisions in the United States

Constitution, an action which is allowed under plaintiff's First Amendment right to petition the

government (i.e, to file a lawsuit) for a redress from unconstitutional laws, including state and

local laws, as established under Ex Parte Young 209 U.S. 123 (1908).

11. The Central District of California, Western Division, is the proper venue for this action

because plaintiff works and resides in Los Angeles, CA, and the violation of plaintiff's rights

described above has taken place daily since plaintiff moved to Los Angeles from a brief residence

in Gulf Shores, Alabama, a year ago on March 9, 2021.

## Standing

12.  Standing is a made-up notion that is currently being abused by the federal court system to get out of having to do its most important and also its most difficult job, which is protecting the least powerful of all (a lone pro se litigant filing a constitutional challenge) from the most powerful of all (the government that issued the law in question).

13.  The First Amendment to the U.S. Constitution wisely dictates that pro se constitutional challenges are the most important lawsuits filed in any court.  The court should therefore be handling pro se constitutional challenges the same way any department store handles a complaint from a customer, that is, with utmost deference to the customer.  Telling the customer their complaint is unacceptable because the customer did not pay a complaint fee is just as ridiculous in the court setting as it is in the retail setting.  Likewise, dismissing the complaint as invalid before even contacting the manager of the department where the complaint originated to see what the manager has to say is just as ridiculous in the court setting as it is in the retail setting.  Telling the customer that the complaint is "not my problem" until the customer pays somebody to deliver the complaint to the proper manager in charge, which apparently the customer is supposed to know inherently, is just as ridiculous in the court setting as it is in the retail setting.  Finally, telling the customer to go away with their complaint, once again before even contacting any managers for a response or an explanation, and come back when the damage done to the customer is more than just a "minor inconvenience for the greater good of the store and of other customers" is just as ridiculous in the court setting as it is in the retail setting.

14.  If the court were run as the Framers of the Constitution intended, a person of questionable citizenship who does not even speak English could hand-write on the back of a paper napkin in Spanish and mail to the court the following:

Verified Complaint

6

"Dear court, when I go shopping for food in a store and they tell me I have to put on a mask and stay away from everybody else, or when I go to the local 24 Hour Fitness Gym to take a shower because I am homeless, and they tell me I can not enter unless I prove that I got a shot in the arm that I do not trust as safe or because I did not allow people I do not trust to stick a Q-tip up my nose so far it makes my eyes water, it feels like my fundamental rights are being violated.  Please stop these people from doing these things.  Thank you.  Sincerely, a person who prefers to remain anonymous out of fear of retaliation from these people I do not trust, but I will give you my name and address as required because that is how important this issue is to me and to the future of my children - and I trust you will help me…"

And it would be *up to the court,* not the person who sent this to the court, to figure out the proper government entity or person this complaint should be forwarded to (exactly as is without editing or comment and for no fee) for a response and an explanation, i.e., any human stating to the court in any shape, way, or form in a non-anonymous fashion that they believe a law may be violating a personal right has "standing" under the First Amendment right to petition the government for a redress of grievances from unconstitutional laws.

15.  The pro se constitutional challenge therefore cannot be dismissed without the court, at the very least, contacting the government entity responsible and requesting a response or explanation, regardless of how trivial or misguided the complaint may appear.  This is an act that is currently very difficult and costly for most citizens to figure out and do on their own but is very easy and cost-effective for the court to do because in pro se constitutional challenges there is a limited number of relevant government figures that can and should be contacted by the court on a regular basis for these types of lawsuits, namely, the mayor and/or district attorney at the local level, the governor and/or state attorney general at the state level, and the president and/or the United States Attorney General at the national level.  Pro se constitutional challenges were meant to give important feedback to these government figures regardless of the validity of the complaint.

16.  Plaintiff has no doubt this is how the court will be run in the future because the

fundamental laws of efficient and peaceful self-governing as laid out for the first time in detail by the Framers of the U.S. Constitution are like the laws of physics – they are not up for debate and cannot be altered out of convenience.  The way the current court system is run is therefore unsustainable and will eventually collapse under its own weight if the system does not change, probably sooner rather than later given the responses plaintiff got from her 49 original anti-mask lawsuits filed in 2020.

17.  That being said, this complaint meets the requirements of standing even under the current scheme used by the court insisting that the burden is on plaintiff (the customer) to establish injury, causation, and redressability.  First, plaintiff's rights listed above in paragraph 5 pertaining to face mask mandates and social distancing mandates have been violated daily for a year, and plaintiff's rights pertaining to testing and vaccine mandates have been violated daily since these mandates were issued a few months ago, establishing injury.  Second, this injury was caused by defendants' orders because plaintiff's workplace and all the places of business plaintiff has frequented in Los Angeles City, in Los Angeles County, and in California in the past year claim in posted signs that the requirements of face masks, social distancing, testing and vaccine mandates are all because of state and local mandates, establishing causation.  Finally, the court can and should grant plaintiff's request for an injunction barring defendants from violating plaintiff's rights, not just currently but *ever again,* over any fraudulent orders stemming from a false emergency, establishing redressability.

## Parties

18.  Plaintiff Huguette Nicole Young (nee Pelletier) currently works for minimum wage as shelf-stocker at Target store #0228 in the West Hills neighborhood of Los Angeles, where

Verified Complaint

plaintiff has lived in her car since arriving in Los Angeles on March 9, 2021.  Plaintiff is a law

school graduate, a Ph.D. chemist, and was once a well-established biochemistry researcher.

Plaintiff had even been offered a position to work as a principal investigator at the National

Institute of Allergy and Infectious Diseases (NIAID) in Bethesda, MD, in 1997 by the director

himself, Anthony Fauci, that is, until Fauci made good on a thinly veiled threat to make sure

plaintiff never got another government grant if she did not drop a lawsuit that she had filed in

1994 against Pfizer for stealing data from her, for fabricating what they could not steal and – in

the straw that broke the camel's back and that drew the lawsuit in the first place – publishing

everything as their own work product (Dalton, R. Espionage verdict prompts call for retraction of

polymerase paper. *Nature* 393, 504 (1998). https://doi.org/10.1038/31064; Dalton, R. US court

slashes damages in polymerase-β theft case. *Nature* 407, 824 (2000).

https://doi.org/10.1038/35038228 ).  What these news articles do not mention is that Pfizer

unknowingly reported physically impossible phenomena when they fabricated data that they

could not steal from plaintiff.  This fabricated data contradicted plaintiff's real data, has never

been reproduced, and is still reported in the scientific literature to this day despite Herculean

efforts by plaintiff to force Pfizer to either produce the raw data leading to the questionable

results or have the questionable results removed from the literature as falsified.  These

experiences along with plaintiff's educational background have put plaintiff in the best position

possible to expose the fraud she calls #FakePandemicHolocaust since it is very easy for plaintiff

to believe something like this is not only possible, but is highly likely given the immunity the

United States Congress (and presumably many other legislative bodies around the world) has

granted the pharmaceutical industry from lawsuits and other forms of public scrutiny and

oversight.

19.  Defendant Eric Garcetti is the mayor of Los Angeles, California, and is responsible for

issuing and enforcing all the emergency Covid-19 related orders in Los Angeles City since early 2020.

20. Defendant Mike Feuer is the city attorney for Los Angeles, California, and is responsible for enforcing Los Angeles City laws and orders, including all of Mayor Garcetti's Covid-19 related emergency orders.

21. Defendant Los Angeles County Board of Supervisors has a unique role of serving as both the executive and legislative branch of Los Angeles County's governing body and is responsible for issuing and enforcing all the emergency Covid-19 related orders in Los Angeles County since early 2020.

22. Defendant George Gascon is the district attorney for Los Angeles County and is responsible for enforcing Los Angeles County laws and orders, including all of Los Angeles Board of Supervisors' Covid-19 related emergency orders.

23. Defendant Gavin Newsom is the governor of California and is responsible for issuing and enforcing all the emergency Covid-19 related orders in the state of California since early 2020.

24. Defendant Rob Bonta is the attorney general for the state of California and is responsible for enforcing California state laws and orders, including all of Governor Newsom's Covid-19 related emergency orders.

## Legal Context

25.  In a pro se constitutional challenge the burden of proof is on the government, not plaintiff, to explain why the challenged law or laws should not be struck down as a violation of the United States Constitution.  The level of scrutiny applied by the court is up for debate, but the burden of explanation is *always on the government* (plaintiff has no citation here – she just

learned this in law school and is confused why she is the one who must provide the citation to establish this inherently logical legal concept, as if it is up to the customer to do the job of the store director and explain to the store director how the store is supposed to be run).

26. If plaintiff can get the court to agree with this one, simple, well-established legal concept in United States jurisprudence, and if within days of filing this complaint plaintiff can get the court to serve this complaint on the six defendants listed (or any other defendants the court finds more appropriate since it is not up to plaintiff to be an expert on retail management) exactly as is without any pushback or hassles from the court on behalf of defendants concerning false notions of standing, and if plaintiff can get the court to request an official public answer to this complaint in a timely fashion from defendants so that all citizens can see what defendants have to say on this important issue in an official capacity and in a venue that has been designed to elicit facts and truth under the watchful eye of Lady Justice (at least more than the media has the will or the power to do), the court will have come a long way toward helping us get to inevitable, sustained world peace since the 49 original complaints plaintiff filed on this matter in 2020, and plaintiff will feel satisfied.

27. Another area the court needs improvement is in the notion that there is no equality clause in the original Constitution when in fact there are four equality clauses:  There are two "no titles of nobility" clauses, one as applied to the federal government (U.S. Const.  art. I,  § 9, cl. 8) and one as applied to the states (U.S. Const.  art. I,  § 10, cl. 1), which dictate that the government will not treat any citizen better than another for arbitrary reasons, and there are two "no bills of attainder" clauses, one as applied to the federal government (U.S. Const.  art. I,  § 9, cl. 3) and one as applied to the states (U.S. Const.  art. I,  § 10, cl. 1), which dictate that the government will not treat any citizen worse than any other citizen for arbitrary reasons.

28. Plaintiff is (correctly, though this should not be a requirement for pro se constitutional

challenges) filing a portion of this constitutional challenge under a claim that testing and vaccine

mandates violate the equality clause that prohibits state and local governments from treating a

citizen worse than other citizens for arbitrary reasons (U.S. Const. art. I, § 10, cl. 1).

29.  The following legal analysis of bills of attainder comes from Cornell University's

Legal Information Institute at https://tinyurl.com/2p86xycs:

"Bills of attainder . . . are such special acts of the legislature, as inflict capital punishments upon persons supposed to be guilty of high offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings. If an act inflicts a milder degree of punishment than death, it is called a bill of pains and penalties. . . . In such cases, the legislature assumes judicial magistracy, pronouncing upon the guilt of the party without any of the common forms and guards of trial, and satisfying itself with proofs, when such proofs are within its reach, whether they are conformable to the rules of evidence, or not. In short, in all such cases, the legislature exercises the highest power of sovereignty, and what may be properly deemed an irresponsible despotic discretion, being governed solely by what it deems political necessity or expediency, and too often under the influence of unreasonable fears, or unfounded suspicions." [J. Story, Commentaries on the Constitution of the United States 1338 (1833)].

The phrase "bill of attainder," as used in this clause and in clause 1 of § 10, applies to bills of pains and penalties as well as to the traditional bills of attainder. [Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 323 (1867); *cf.* United States v. Brown, 381 U.S. 437, 441–442 (1965)].  The prohibition embodied in this clause is not to be narrowly construed in the context of traditional forms but is to be interpreted in accordance with the designs of the framers so as to preclude trial by legislature, which would violate the separation of powers. [United States v. Brown, 381 U.S. 437, 442–46 (1965). Four dissenting Justices, however, denied that any separation of powers concept underlay the clause. *Id.* at 472–73]. The clause thus prohibits all legislative acts, "no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial. . . ." [United States v. Lovett, 328 U.S. 303, 315 (1946)].

30.  Mandates that target, separate out, and punish a group of citizens for not being tested

or vaccinated for Covid-19 are arbitrary because they are separating out and punishing citizens

that are not participating in the kickback scams defendants have concocted with vaccine makers

and test suppliers.  If the goal is to determine which citizens are most likely to spread Covid-19

(which itself is an unconstitutional government goal because there is no right of citizens to be

protected from natural causes, including viruses people carry around daily), results of an antibody test – *and no other information* – would be needed or should be required.

31. Finally, the court errs in requiring only the lowest standard – the rational basis standard – for laws violating any of the equality clauses.  Protection of equality rights, which the Framers considered even more important than the personal rights listed in the Bill of Rights since equality rights were incorporated into the original seven articles, is of utmost importance because the most critical step of every holocaust, including the Jewish Holocaust and the current #FakePandemicHolocaust (which will no doubt far surpass the Jewish Holocaust in worldwide starvation deaths), is to violate equality clauses by separating out and punishing a distinct group of people for arbitrary, usually political, reasons.  The only difference between Adolf Hitler and defendants is that Hitler acted more democratically because he at least got permission from his legislature to violate the German equivalent of the no bills of attainder clause. Defendants, in contrast, are behaving even more despotic than Hitler in bypassing this step entirely in their fascist, false emergency orders.  And for anybody balking at comparisons of closeted gay Adolf Hitler and closeted gay Joseph Goebbels with the current closted gay men listed above running the current #FakePandemicHolocaust, go take your swastika and shove it.

### Facts

32. Defendants claim that Covid-19 has caused a pandemic, allowing defendants to issue Covid-19 related facemask, social distancing, testing, and vaccine orders as emergency declarations.

33.  Covid-19 has never been established as a pandemic with publicly available mortality data.

34.  The 2020 California mortality data that defendants finally made publicly available in

October of 2021 show that Covid-19 is less deadly than the flu and that defendants have been fraudulently manipulating 2020 California death mortality statistics to make previously unreported deaths from large ethnic populations, especially many new deaths from a rapidly growing Alzheimer's disease problem, look like excess deaths from Covid-19 (Attachment 2).

35.  In addition to explaining the odd phenomena plaintiff reported in Attachment 2 that exposed obvious patterns of data manipulation of death statistics, defendants are asked by plaintiff to explain a questionable practice observed only with California death statistics where the deaths reported for several diseases like pneumonia and flu (PNF), chronic lower respiratory disease (CLD),  Alzheimer's Disease (ALZ), and stroke (STK) overlap and have nearly the exact same death counts reported every month for years at a time (Figure 1).



Figure 1:  Monthly death counts were obtained from California Department of Health and Human Services online data portal at https://data.chhs.ca.gov/dataset/statewide-death-profiles. Similar monthly death counts for California can be obtained from CDC Wonder at http://wonder.cdc.gov/, but monthly data for California at that web portal only go as far back as 1999. Only death counts for the months of December and June from 1979 to 2021 are displayed in Figure 1 for clarity. Inexplicably strong, almost identical, data overlaps occur every month for years at a time as follows: PNF and CLD (1986-1998); PNF and ALZ (2004-2006); CLD, ALZ, and STK (2012-2016); ALZ and STK (2013-2021)

Verified Complaint

36.  Since 1934, when W. F. Wells provided initial evidence that viruses and bacteria could not be spread through the air by infected people simply breathing in and out without coughing or sneezing ("On Air-borne Infections:  Study II. Droplets and Droplet Nuclei", W. F. Wells, *American Journal of Epidemiology*, Volume 20, Issue 3, November 1934, Pages 611–618, https://doi.org/10.1093/oxfordjournals.aje.a118097) – a finding that was further confirmed for Covid-19 in 2020 [Leung, N.H.L., Chu, D.K.W., Shiu, E.Y.C. *et al.* Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nat Med* 26, 676–680 (2020). https://doi.org/10.1038/s41591-020-0843-2] – there has yet been any legitimate scientific data establishing that Covid-19 or any other virus can spread through the air by infectious people simply breathing in and out.[1]

37.  The primary method of spread of Covid-19 and many other viruses including flu is through contact, and the primary method of spread of Covid-19 and many other viruses and bacteria after face mask mandates were issued is through contact in public areas like grocery stores with contaminated masks grocery workers and the public are forced to wear.

38.  Social distancing orders that have closed down economies unnecessarily for *almost two years* have most likely killed millions, if not tens of millions, of people worldwide through starvation, which is millions to tens of millions of people more than social distancing orders have ever saved, all so pharmaceutical companies and the politicians like defendants that they have bought could make a little political and monetary profit.

[1]Wells was first to show that bacteria and virus particles required hydration to survive and that these particles do not survive very long in aerosol form, where tiny droplets of water containing these particles dry out so quickly that these usually harmful particles are denatured and rendered harmless within milliseconds of being expelled from the body. This is a concept that both Rosalind Franklin and plaintiff understood all too well when carrying out their x-ray crystallography research work with crystals of biological macromolecules. In fact, Rosalind Franklin's brilliant method of encapsulating these crystals in an enclosed capillary tube with a hydrating solution to prevent the crystals from "drying out" and causing the biological macromolecules to denature not only allowed the structure of DNA to be determined but is still being used to this day as a critical step for data collection in x-ray crystallography laboratories around the world.

Verified Complaint

15

39.  The best protection against any virus is natural immunity.

40.  The best test to see who has natural immunity is the antibody test.

41.  The antibody test has systematically been suppressed and downplayed by defendants because they had already made lucrative deals with less safe, less reliable, misleading PCR tests that allowed defendants to gather much desired DNA data on test takers, most of whom were taking these tests non-anonymously, a critical feature that added value to the DNA collection fraud and formed the main impetus behind the vaccine mandates, not public safety.

42.  There is no valid scientific reason anybody, but especially young children, should be receiving Covid-19 vaccinations, and in fact the opposite is true:  Covid-19 vaccines should be *halted immediately, especially for children* until more information can be gathered about the mortality data results and issues plaintiff has raised here and in Attachment 1.


# Conclusion

The court should strike down all Covid-19 related emergency orders by defendants *immediately* for three independent reasons:

1)  Defendants have never established that Covid-19 has killed or injured more people than the flu in this jurisdiction using standard scientific methods, and in fact a false Covid-19 emergency seems to have been created and perpetuated by defendants for the purpose of covering up a real pandemic looming – the Alzheimer's Pandemic – among other sinister purposes, such as rendering an entire generation of young Hispanic and Asian California schoolgirls infertile.

Verified Complaint

2) Defendants have not shown that their Covid-19 emergency orders are fact-based and that the orders do more good than harm.

3) Defendants have not established that a right to not be exposed to nature and natural disasters even exists, much less that such a right trumps any of the fundamental rights listed by plaintiff in this complaint that are being violated by defendants' Covid-19 emergency orders.

## Prayer for relief

WHEREFORE, plaintiff respectfully prays that the court:

1. Enter a declaration that all current Covid-19 related emergency orders and laws issued by defendants are void.

2. Enter a declaration that all past and future Covid-19 related emergency orders will be void unless and until defendants establish that Covid-19 is an emergency pandemic-level virus that kills or injures more people than the flu.

3. Enter a preliminary and permanent injunction barring defendants from enforcing any Covid-19 related emergency orders and laws.

4. Enter a judgement for plaintiff.

5. Award fees and costs to plaintiff.

6. Grant such further and other relief as the Court deems just and proper.

Verified Complaint

## Verification

I, Huguette Nicole Young (nee Pelletier), am the plaintiff in the above-entitled action. I have read the foregoing and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.  I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Burbank, CA.

DATED:  03/09/2022

*Huguette Nicole Young*

Huguette Nicole Young, Ph.D., J.D., Pro se

Verified Complaint

# Attachment 1

Summary of Anti-Face Mask Complaint Filed in 49 Different

U.S. District Court Jurisdictions

Table 1: Summary of Anti-Face Mask Complaint Filed in 49 Different U.S. District Court Jurisdictions, 2/11/2021

| Jurisdiction | Pro se filers allowed to open case online? | Email communications eventually allowed for pro se filers? | Case name/ case number | Standing granted? | Appl. to Proceed In Forma Pauperis granted? | Motion to reconsider filed? | Reversal of dismissal of case granted? | Circuit court of appeals/ appeal number |
|---|---|---|---|---|---|---|---|---|
| 1. Maine | N | Y | Young v. Frey 1:20-cv-367-NT | Y | N | Y | N | 1st/ 21-1026 |
| 2. Massachusetts | N | N | Young v. Healey 1:20-cv-11832-RGS | N | TBD | Y | N | 1st/ 21-1039 |
| 3. New Hampshire, City of Portsmouth | N | Y | Young v. Becksted 1:20-cv-01080-LM | N | TBD | Y | TBD | 1st/ |
| 4. Rhode Island | N | N | Young v. Neronha 1:20-cv-00443-MSM-LDA | TBD | TBD | | | 1st/ |
| 5. Connecticut | N | Y | Young v. Tong 3:20-cv-01521-JAM | Y | N | Y | N | 2nd/ 21-49 |
| 6. New York, Southern District | Y | Y | Young v. James 1:20-cv-08252-PAE | Y | Y | | | 2nd/ |
| 7. Vermont | N | Y | Young v. Donovan 5:20-cv-175 | Y | N | Y | N | 2nd/ 21-159 |

| Jurisdiction | | | Case | | | | | Circuit / No. |
|---|---|---|---|---|---|---|---|---|
| 8. Delaware | N | N | Young v. Jennings 20-1383-CFC | Y | N | Y | N | 3rd/ ? |
| 9. New Jersey | Y | N | Young v. Grewal 3:20-cv-13863 | TBD | TBD | | | 3rd/ |
| 10. Pennsylvania, Eastern District | Y | Y | Young v. Shapiro 2:20-cv-04900-KSM | Y | N | Y | N | 3rd/ 20-3146 |
| 11. Maryland | N | send: N receive: Y | Young v. Frosh 1:20-cv-02935-ELH | N | TBD | Y | N | 4th/ 21-1109 |
| 12. North Carolina, Eastern District | N | Y | Young v. Stein 5:20-cv-540-FL | TBD | TBD | | | 4th/ |
| 13. Virginia, Eastern District | N | N | Young v. Herring 3:20-cv-00799 | TBD | TBD | | | 4th/ |
| 14. West Virginia, Southern District | N | N | Young v. Morrisey 2:20-cv-0666 | Y | N | Y | TBD | 4th/ |
| 15. Louisiana, Eastern District | Y | send: Y receive: N | Young v. Landry 20-2730B2 | Y | N | Y | N | 5th/ ? |
| 16. Mississippi, Southern District | N | N | Young v. Lumumba 3:20-cv-00699-CWR-FKB | N | Y | Y | TBD | 5th/ |
| 17. Texas, Northern District | N | Y | Young v. Paxton 4:20-cv-839-P-BP | Y | N | Y | N | 5th/ 20-11124 |
| 18. Kentucky, Western District | Y | Y | Young v. Cameron 3:20-cv-00680-BJB-CHL | Y | N | Y | TBD | 6th/ |

| State / District | | | Case | | | | | Circuit |
|---|---|---|---|---|---|---|---|---|
| 19. Michigan, Eastern District | Y | Y | Young v. Nessel 5:20-cv-12707 | TBD | TBD | TBD | | 6th/ |
| 20. Ohio, Southern District | N | N | Young v. Yost 2:20-cv-05236-EAS-KAJ | Y | N | Y | N | 6th/ 20-4199 |
| 21. Tennessee, Eastern, Sullivan County | N | N | Young v. Venable 2:20-cv-00226-TRM-CRW | N | TBD | Y | N | 6th/ 21-5029 |
| 22. Illinois, Southern District | Y | send: Y receive: N | Young v. Raoul 2:20-cv-00226-TRM-CRW | N | TBD | Y | TBD | 7th/ |
| 23. Illinois, Central District | Y | send: Y receive: N | Young v. Raoul 20-3266 | N | Y | Y | TBD | 7th/ |
| 24. Illinois, Northern District | Y | Y | Young v. Raoul 1:20-cv-05916 | Y | N | Y | N | 7th/ 21-1109 |
| 25. Indiana, Southern District | Y | send: Y receive: N | Young v. Hill 1:20-cv-02575-RLY-TAB | N | Y | Y | TBD | 7th/ |
| 26. Wisconsin, Western District | N | N | Young v. Kaul 20-cv-935-wmc | Y | N | N | N | 7th/ 21-1053 |
| 27. Arkansas, Eastern District | N | N | Young v. Rutledge 4:20-cv-01185-BRW | N | TBD | TBD | N | 8th/ 20-3361 |
| 28. Iowa, Southern, City of Des Moines | N | N | Young v. Cownie 4:20-cv-00338-JAJ | Y | N | Y | TBD | 8th/ |
| 29. Minnesota 612-664-5000 | N | N | Young v. Ellison 20-cv-2144-JRT-DTS | TBD | TBD | TBD | | 8th/ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 30. Missouri, Western, City of Kansas City | N | Y | Young v. Lucas 4:20-cv-00880-NKL | Y | N | Y | N | 8th/? |
| 31. Nebraska, City of Omaha | N | Y | Young v. Stothert 8:20-cv-00460 | Y | N | Y | TBD | 8th/ |
| 32. Arizona | N | send: N receive: Y | Young v. Brnovich cv-20-1686-PHX-GMS | Y | N | Y | N | 9th/ 20-17212 |
| 33. California, Northern District | N | Y | Young v. Becerra 3:20-cv-05628-JD | Y | N | Y | TBD | 9th/ |
| 34. Hawaii | Y | Y | Young v. Connors 1:20-cv-00425-DKW-KJM | N | N | Y | N | 9th/ 20-17187 |
| 35. Idaho, City of Boise | Y | N | Young v. McLean 1:20-cv-417 | Y | N | Y | N | 9th/ 21-35024 |
| 36. Montana | Y | Y | Young v. Fox 6:20-cv-00065-CCL | Y | N | Y | N | 9th/ 20-35957 |
| 37. Nevada | Y | Y | Young v. Ford 3:20-cv-452-RCJ-WCG | TBD | TBD | | | 9th/ |
| 38. Oregon | Y | Y | Young v. Rosenbloom 3:20-cv-452-RCJ-WCG | Y | N | Y | N | 9th/ 21-35050 |
| 39. Washington, Eastern District | N | Y | Young v. Ferguson 2:20-cv-00277-RMP | Y | N | Y | N | 9th/ 21-35020 |
| 40. Colorado | N | Y | Young v. Weiser 1:20-cv-02485 | Y | N | Y | N | 10th/ 20-1341 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 41. Kansas | Y | Y | Young v. Schmidt 6:20-cv-01268-DDC-GEB | Y | N | Y | TBD | 10th/ |
| 42. New Mexico | N | Y | Young v. Balderas 2:20-cv-00789-SMV | Y | N | Y | N | 10th/ 20-2141 |
| 43. Oklahoma, Northern City of Tulsa | N | Y | Young v. Bynum 20-cv-0560-CVE-CDL | Y | N | Y | TBD | 10th/ |
| 44. Utah, Salt Lake County | Y | send: Y receive: N | Young v. Wilson 2:20-cv-00597-HCN | Y | N | Y | TBD | 10th/ |
| 45. Wyoming, Laramie County | Y | Y | Young v. Hill 20-CV-203-F | Y | N | Y | N | 10th/ 21-8002 |
| 46. Alabama, Southern District | Y | Y | Young v. Marshall 1:20-cv-00495-JB-MU | N | TBD | Y | N | 11th/ 21-10409 |
| 47. Florida, Northern City of Pensacola | N | N | Young v. Robinson 3:21-cv-66-TKW-HTC | Y | N | Y | TBD | 11th/ |
| 48. Georgia, Northern City of Atlanta | N | N | Young v. Bottoms 1:20-cv-04431-TWT | N | Y | Y | TBD | 11th/ |
| 49. Washington, DC | Y | send: Y receive: N | Young v. Bowser 20-cv-2883 (UNA) | Y | N | Y | N | DC/ 21-7002 |

# Attachment 2

Young, H.N.

Covid-19's true death toll: millions less than official counts

# Covid-19's true death toll: millions less than official counts

An apparent algorithm that undercounts the deaths of large ethnic populations with distinctive surnames has led to wildly inaccurate excess death counts in the U.S. (and most likely worldwide), helping to cover up signs of a true pandemic on the horizon: The Alzheimer's Pandemic.

Accurate population and death counts are essential for making the best health and policy decisions. This has been true long before Covid-19 and all the odd anomalies in death statistics attributed to this purportedly deadly virus.  As an example, a brilliant taxing scheme in the United States Constitution (at Article I, Section II, Clause III) that protects the fundamental human right of *no taxation without representation* links taxation and representation at the national level directly to one metric: The population of each state in the union. The larger the population of a state, the more representatives the state gets in the United States House of Representatives, but the catch is that the state also has to pay proportionately more to the federal government in taxes.

Tying taxation to population in this manner disincentivized the states from overinflating their population numbers just to gain more power in Congress, that is, until the ratification of the 16th Amendment in 1913, which destroyed this taxing scheme and granted the United States Congress the power to tax citizens directly (like a king) with no correlation to state populations or numbers of representatives in Congress.

1

Strong incentives for states to over-inflate population counts after the 16th Amendment (incentives that may exist worldwide since no other country in the world protects an individual's fundamental human right to *no taxation without representation* that was originally listed as the first and most important right to be protected in the U.S. Constitution) is only half the story leading to inaccurate population counts and death rates in the United States: States are also pressured to under-count deaths of residents to make public health policies appear better than they really are.

It is proposed the main method of artificially lowering death rates is for a state to include all members of large ethnic or immigrant groups in the population count regardless of citizenship or resident status (thereby inflating population numbers) but then exclude a large portion of the deaths coming from these same population groups in the death counts, having the overall effect of artificially lowering death rates.  It is further proposed only the largest ethnic groups with distinctive surnames – namely, Latinos, Chinese, Indians, and in some cases French Canadians and Franco-Americans – were targeted for this practice to facilitate accurate determination of ethnicity or race quickly and easily (a common practice called surname analysis) while at the same time decreasing chances of being detected because of the large numbers of people with similar names being processed.

Such practices have not only allowed state health policies to appear better than they really are, but in recent years it has allowed for the purposeful coverup of a real pandemic on the horizon: The Alzheimer's Pandemic.

## More anomalies than logical explanations

Calculating excess deaths is the preferred method to estimate the death toll of a catastrophic event such as a global pandemic.[1]  There are two main caveats to this method, however:  1) Accurate population and death counts are required for accurate excess death counts, and 2) a clear connection must be established between excess death counts and the catastrophic event. So far neither caveat has been overcome in reports of excess deaths attributed to Covid-19, leading to more anomalies than logical explanations of Covid-19 behavior.

One example that highlights problems caused by inaccurate population and/or death counts are reports that Covid-19 disproportionately kills Hispanics, Asians, and blacks relative to whites,[2] but this claim only appears to be true in the United States. That Covid-19 is the cause of disproportionately large death rates for these minority populations in 2020 also does not explain why these populations have been suffering disproportionately large death rates in the United States every year since the 2010 census, not just in 2020, nor why these same populations enjoyed disproportionately lower death rates in the United States every year from 2000 to 2010.

A second example, this time revealing a failure to link excess deaths directly to Covid-19, is the fact that many other causes of death have contributed to excess death counts in 2020, at least in the United States (Figure 1).  Maybe there is a stretch of an explanation for why deaths attributed to diseases other than Covid-19, such as heart disease, stroke, diabetes, and chronic liver disease, all contributed significantly to excess death counts in 2020. For instance, maybe the lockdowns made access to proper medical care for people suffering from these diseases more difficult (and

3

if this is true, the lockdowns killed more people in 2020 than Covid-19) or maybe Covid-19 weakened the body's defenses against these causes of death.  However, not even a stretch of a logical explanation can be put forth for how or why Covid-19 caused a significant increase in deaths from Alzheimer's disease, dementia, and the most difficult of all to explain - deaths from accidental overdose of opioids and other prescription drugs.  These last three causes of death are included on the list of top seven causes of death, other than purported deaths from Covid-19, contributing to excess deaths counts in the United States in 2020 (Figure 1).



Figure 1:  Crude cause of death rates were retrieved from United States Centers for Disease Control and Prevention. CDC Wonder. http://wonder.cdc.gov/  February, 2022. The following ICD-10 categories were included for each cause of death: Heart disease (I00-I51), Alzheimer's disease (G30-G31), stroke (I60-I69), dementia (F01, F03), diabetes (E10-E14), accidental overdose (X42, X44), and liver disease (K70-K76). The graph line for heart disease is not to scale; death rates for heart disease were divided by 4 in order to be able to display the line more easily with all other causes of death.

## What's really going on: The Alzheimer's Pandemic

A cursory, bird's-eye look at population rates, death rates, and causes of death contributing to the

4

high excess death counts in the United States in 2020 reveals three strong correlations in the data:

1) States with the highest estimated population of immigrants such as California and Texas have the lowest death rates,

2) Excess deaths reported for 2020 in the United States and in many individual states appear to be related to the difference between the death rate in 2019 (or the average death rate from 2015 to 2019, whichever method is preferred) and a universal death rate of about 1% [e.g. the death rate of the U.S. in 2019 was 0.87%, predicting that the 2020 excess death count would be (1% - 0.87%) x U.S. population in 2020 =  428,329, a number within the range of reported excess death counts for the U.S.]

3) The average age and number of people dying of accidental overdose by opioids has steadily increased since 2000 at about the same rate as people dying of dementia and of Alzheimer's disease, and all three causes of death have increased at a greater rate than any other causes of death since 2000, with the single biggest year increases for all three happening from 2019 to 2020.

These correlations have seemingly nothing to do with Covid-19 and more to do with systematic, purposeful manipulations of population and death statistics to achieve several sinister goals other than simply inflating population counts to gain greater power for states in Congress.  For example, the Alzheimer's, dementia, and opioid overdose data suggest that large increases in rates of these three causes of death since the year 2000 are related and that perhaps Alzheimer's

5

and dementia patients, who share a common cause for the increased rates of these illnesses, are being euthanized by purposeful overdoses of their prescription medications.  These deaths, which should be counted as Alzheimer's or dementia deaths, are being swept under the rug and hidden under the general category of accidental deaths (along with car accidents and falls) as accidental overdoses.

If these misrepresentations of death statistics, which appear far from accidental, are valid it suggests the cause of a looming Alzheimer's Pandemic is already well known and implicates the pharmaceutical industry in its origins.  One such cause could be an overuse of antidepressants like Prozac or Zoloft or some other prescription drug that is ubiquitous and presumed safe but that will be exposed as highly dangerous (no thanks to the pharmaceutical industry covering it up with the help of certain government agencies) once the correct models for excess deaths and causes of death become more accurate going forward. Such an unfortunate scenario is similar to the clear connection between smoking and lung cancer that the tobacco industry covered up and denied for decades with the help of certain government agencies while both entities were fully aware of exactly what was going on.

## And the good news (?) is…  a 1% universal death rate

In the search for a better explanation, there was much support in the data for the existence of a universal death rate of about 1% that applies to all humans equally regardless of race, education, access to medical care, or any other factors currently used to accentuate differences among us. There was also much support for the idea that states reporting death rates lower than this universal death rate of 1% were artificially lowering their death rates by manipulating death

statistics from immigrant or ethnic populations.  As a human being who bleeds red like everybody else, this is the one finding - a universal death rate  -  that is hoped stands the test of time more than anything else reported here.

Evidence that the universal death rate, if it exists, is around 1% and that this universal death rate is affected by immigrant populations comes from a graph of the U.S. death rate by decade superimposed on a graph of immigrant population rates (Figure 2).



Figure 2:  U.S. death rates for 1900-1960 were obtained from the Department of Health and Human Services, National Center for Health Statistics, Centers for Disease Control and Prevention; *National Vital Statistics Reports*. Web: www.dhhs.gov, www.cdc.gov. February, 2022, and U.S. death rates for 1970-2020 were obtained from CDC Wonder (1970-2020).  http://wonder.cdc.gov/  February, 2022.  U.S. immigrant population rates were obtained from Migration Policy Institute: U.S. *Immigrant Population and Share over Time, 1850-Present.* www.migrationpolicy.org/programs/data-hub/charts/immigrant-population-over-time, and from the United States Census Bureau; *Historical Census Statistics on the Foreign-born Population of the United States: 1850 to 2000* https://www.census.gov/content/dam/Census/library/working-papers/2006/demo/POP-twps0081.pdf.

Figure 2 shows the U.S. death rate declined rapidly at the beginning of the 20th Century, most likely due to improvements in medicine, until 1950 when medical improvements apparently

reached a limit in what they could do for humans, and the death rate stabilized at around 1% for two decades. However, this stabilization of the death rate at 1% coincided with a lull in immigrant population numbers. With the large influx of immigrants beginning around 1970 comes a corresponding decrease in U.S. death rates that lasted 40 years until 2010.  As described below, 2010 is the census year when policy changes in census forms and in death certificates created a perfect storm that allowed for the most inaccurate reporting of population and death counts by the states and, not coincidentally, the lowest reported death rates in history for many states, including all states with immigrant populations of 10% or greater.

## The "Cuban Pandemic" of 1966

The most compelling evidence that immigrant populations are manipulated by the states to over-inflate citizen population counts and underestimate death counts comes from a comparison of the U.S. death rate with the death rates of the top six most populous states from 1940 to 2020 (with the year 2019 included for reference) (Figure 3).  All six states seem to track, more or less, with the general pattern described above for the United States:  Death rates decreased significantly until 1950, leveled out somewhat from 1950 to 1970, then decreased again until they hit historic death rate lows in 2010.

**Death rates for the U.S. and the top six most populous states by decade**



Figure 3:  Death rates for 1940-1960 were obtained from the Department of Health and Human Services, National Center for Health Statistics, Centers for Disease Control and Prevention; *National Vital Statistics Reports*. Web: www.dhhs.gov, www.cdc.gov. February, 2022, and death rates for 1970-2020 were obtained from CDC Wonder. http://wonder.cdc.gov/  February, 2022.

Two standouts in the 1950 to 1970 range in Figure 3 are Florida and, to a lesser extent, Texas, both of which seem to have suffered some kind of pandemic between 1960 and 1970 because of the large and sudden increase in death rates.  In reality all that happened between 1960 and 1970 to cause these changes in death rates is The Cuban Adjustment Act of 1966, where Cuban immigrants to the United States (most of whom were political refugees from Fidel Castro's communist revolution in the 1950's who landed in Florida) were granted citizenship on a massive scale.  Once such a high percentage of Cuban immigrants were naturalized it became more difficult for states to manipulate data from this ethnic group in population and death statistics.  Florida, and to a lesser extent Texas, were home to large Cuban immigrant populations at the time and consequently suffered the most from the "Cuban Pandemic" of 1966, which in reality had nothing to do with real deaths but instead simply forced these two states to report

more accurate death rates.

# A perfect storm for fraud

More evidence of a universal death rate of about 1% that can be artificially lowered by

manipulating population and death statistics of large ethnic populations comes from the

observation that the death rate for Pennsylvania, which has consistently had the lowest

immigrant population rate of the top six most populous states –  hovering at about 5% since 1950

– has correspondingly had the highest (and presumably most accurate) consistent death rate

somewhere between 1.0-1.1% from 1950 to 2000.  The only census year the death rate for

Pennsylvania dropped below 1.0% was in 2010, a special census year where many states, and all

states with an immigrant population of greater than 10%, reported their lowest death rates in

history (Figure 3).

Two factors most likely contributed to all states with relatively high immigrant populations

reporting their lowest death rates in 2010:

1)  Beginning in 2005 the U.S. Census Bureau implemented a new method of tracking

    population rates called the American Community Survey (ACS)[3] which, when combined

    with new and better ways of asking questions about race and Hispanic versus

    non-Hispanic origins, allowed for the most accurate, most inclusive population numbers

    in the 2010 census, population numbers that counted previously uncounted residents of

    questionable citizenship status.


2)  With the Internet revolution of the 1990's came complaints in the early 2000's of

increases in identity theft cases due to easier access to social security numbers online.[4] This caused a political push at the state and federal level for better privacy protections of social security numbers on public documents. The end result was legislation making it much more difficult to obtain the social security number of a deceased individual directly from the death certificate.[5]

While legislation making it more difficult to obtain social security numbers from death certificates may have thwarted would-be identity thieves, it allowed better opportunity for states to manipulate death counts from ethnic groups that had correspondingly large numbers of people with questionable citizenship status.  For example, only U.S. citizens and legal residents with a work visa are assigned social security numbers in the United States.  If a death certificate has a social security number displayed and there is no evidence of fraud, it is clear from the death certificate alone that this person should be included in death counts reported at the U.S. Centers for Disease Control (CDC) (CDC death numbers and population numbers used to calculate death rates are supposed to include U.S. citizens and legal residents alone and exclude everybody else). If the social security number is not displayed on the death certificate and it is otherwise difficult to confirm if the deceased even has a social security number, it is much easier for a state to claim the deceased is a non-legal resident to be excluded from death counts even if the deceased is a U.S. citizen. This is especially true if the deceased has an ethnic surname that corresponds to an ethnic group with large populations of non-legal citizens because incorrectly claiming the deceased U.S. citizen with an ethnic surname is a non-legal resident would not raise as many red flags as a non-ethnic surname might.

It is proposed that a perfect storm for fraud occurred in 2010 when relatively high population numbers were reported in the 2010 census due to accurate reporting from American Community Surveys, especially in counts of non-legal residents, while at the same time relatively low death counts were reported in 2010 due to each state's ability to exclude citizens and legal residents from death counts (in addition to non-legal residents) without being detected, especially in counts of large ethnic groups with distinctive surnames that also had correspondingly large immigrant subpopulations.

## A perfect storm for ending the fraud

It is not clear why this perfect storm for fraud ended during the next decade from 2010-2020 (as partially shown in Figure 3, the death rates increased from 2010 to 2019 for all 50 states even before the purported Covid-19 pandemic hit in 2020). Perhaps the advent of popular social media sites made it easier to determine who was a legal resident from a deceased person's online media presence, making it more difficult for states to get away with the fraud. However, regardless of how the beginning of the end of the fraud occurred from 2010 to 2019, it is clear what really ended the fraud almost completely in a big way in 2020 was large monetary incentives for the states to include the deaths of *everybody* in their death counts by way of listing as many deaths as possible as "Covid-19 deaths." There is evidence states were so incentivized in 2020 to report as many deaths as possible they were even reporting – as countable deaths of legal residents – the deaths of non-legal residents who were not reported as part of the population count. Thanks in large part to American Community Surveys, states in 2020 were committed to their population numbers from 2019 that excluded non-legal residents. However, states in 2020 were suddenly including the deaths of previously unreported (in population counts) non-legal

residents in death counts, resulting in artificially high death rates.

This phenomenon was observed mostly in states with the lowest immigrant population rates and gave the appearance that these states were hardest hit by Covid-19.  These states, including Mississippi and West Virginia – the states with the two lowest immigrant population rates at 2% and, not coincidentally, two of the highest death rates in the United States (1.0% and 1.1% in 2010, respectively, and 1.4% and 1.5% in 2020, respectively) – were, in reality, hardest hit with the inability to report fraudulent population and death counts prior to 2020.[1]

While this perfect storm model may need refinements, at least this way of thinking of death rates allows a logical explanation for the race disparities in death rates observed in the United States but not elsewhere from 2000 to 2020:  From 2000 to 2010 deaths from large ethnic populations were artificially excluded from death counts in the U.S. making Hispanics, Asians, and blacks (most likely because of manipulations of death counts for black-latino ethnic populations from caribbean countries like Haiti, Jamaica and the Dominican Republic) appear to have disproportionately lower death rates than whites, but the opposite effect happened from 2010 to 2020; when the fraud became more difficult to pull off starting in 2010, previously excluded deaths from large ethnic populations were now being included at a greater rate every year until 2020 when the most accurate (and most previously underreported) death counts for ethnic populations were reported.

---

[1] It should be noted that West Virginia, the only state with a death rate above 1.0% in 2010, may be reporting accurately high death rates due to the fact that West Virginia has the highest estimated rate for use of antidepressants than any other state in 2020 (https://www.statista.com/statistics/1133632/antidepressant-use-by-state-us/#:~:text=Based%20on%20pharmacy%20claims%20of,%2C%20Vermont%2C%20and%20New%20Hampshire) and may be suffering the earliest and the most deaths from the Alzheimer's Pandemic, although accurate numbers for which states were utilizing antidepressants the most in the 1990's and 2000's may be a more relevant statistic to look at for this purpose, if accurate numbers are available.

## Thinking like a cheating state

A trial and error approach was employed to see if there was a general relationship between death rates and immigrant populations that could be applied to all fifty states.  Data for the 2010 census year were used since this is the census year where fraud seemed most pronounced.

It was clear from the outset that using total immigrant population rates would not work since California and Texas have similar death rates of about 0.6% but very different total immigrant population rates of 27% and 17%, respectively.  Focusing instead on thinking like a cheating state, where planned data manipulations would be less easily detected if hidden behind large populations of people, using population data from only the top three immigrant and ethnic populations in the United States – Latinos, Chinese, and Indians – produced a promising formula early on that generated surprisingly accurate death rates, especially for southern states bordering with Mexico, with the death rates for 35 out of 50 states being predicted within 10% error (Table 1).  The formula is:

> Equation 1:  Artificially lowered death rate = 1.0% - [(total population rate of Latinos, Chinese, and Indians)/100],

where 1.0% is the estimated universal death rate constant.

From a quick glance it seems the fraudsters' purported algorithm from 2010 simply excluded *all* deaths from these three ethnic populations to reach the artificially lowered death rate, but that does not seem at all possible without being detected.  Therefore, even though using a combination of these three population rates seem to predict the most accurate death rates for many of the states, it is still not clear exactly what deaths were actually being excluded in reality.

14

This calculated death rate number may simply represent a number below which the algorithm has determined that fraudulently excluding more deaths from the death count than this number causes too great of risk of being detected or caught.

## And back to the Cuban Pandemic of 1966…

Logical explanations seemed to emerge naturally from the data to explain why population data from many of the remaining 15 states generated relatively large underestimates or overestimates for the death rate using this formula. The most logical explanations came once again when trying to think like a cheating state.  Other than sticking to the largest ethnic populations, three more "rules to live by to evade detection of fraud" emerged that seemed to work well in explaining misses in death rate predictions:

1)  If the formula underestimated the death rate by a significant amount, as what happened with Florida and New Mexico (Table 1), this meant the formula mistakenly included a subpopulation that the fraudsters prefered be left out of the data manipulations for fear of being exposed for fraud.  As explained earlier, the most likely candidate for Florida would be the Cubans, many of whom self-identify as Latinos in population counts. As a result of the Cuban Adjustment Act of 1966 which is still in effect and which causes Cuban immigrants to become naturalized at a rate that is five times faster than all other immigrants, too many Cubans are naturalized U.S. citizens, making manipulation of death data using Cubans too risky.

Similarly, New Mexico has a relatively large Native American population that self-identifies as Hispanic or Latino in population counts.  Like Cubans in Florida, Native Americans in New

15

Mexico, most of whom are U.S. citizens by birth, are too risky to include in populations targeted for data manipulations and fraud.  Once the large Cuban population rate of 6.5% for Florida in 2010 and the large Native American population rate of 10.7% for New Mexico in 2010 are excluded from the respective population rates of Latinos for these two states, the formula produces a death rate that is not as accurate as the other states bordering with Mexico or with the Gulf of Mexico (Florida still misses by -0.10% and New Mexico still misses by -0.14%) but at least these logical modifications got the calculated death rate much closer to the reported death rate for these two states (Table 1).

2)  If the formula overestimated the death rate by a significant amount, as what happened with many states in the North and the Northeast furthest away from the border with Mexico (Table 1), the formula was missing an ethnic population that the fraudsters found desirable to include in the data manipulations.  For the states bordering with Canada the most likely ethnic population candidate is French Canadians and Franco-Americans due to the proximity of these states to the Canadian border (allowing for large, concentrated populations of this ethnic group in these states) and due to the distinctive surnames of this ethnic group, allowing members of this ethnic group to be identified easily with the common ethnic identification technique of surname analysis.[6]  The observation that Louisiana, a state known for its large Franco-American population, was the only state bordering with Mexico or the Gulf of Mexico (other than New Mexico and Florida) for which the original formula was not accurate within 5% error (Table 1) further confirmed data fraudsters may be using surname analysis to determine ethnic backgrounds of targeted ethnic populations, making the French-Canadian ethnic group a likely missing ethnic group causing an overestimate for the calculated death rate in Louisiana as well

despite Louisiana being so far away from the Canadian border.

3) If none of the above explanations applied to a state with a relatively inaccurate death rate prediction, one logical explanation was simply that the population rates for Latinos or Chinese or Indians or, as in the case of Colorado and Utah where Canadian immigrants make up a large portion of total immigrants – population rates of French Canadians – were simply underreported for these states. However, another possible explanation emerged for states like Maryland, Virginia, North Carolina and Georgia – all in the same geographic location on the East Coast and all with relatively large immigrant populations from Central and South America: A majority of the ethnic and immigrant populations for these states probably arrived in the state legally with work visas, and fraudsters found this particular subpopulation attractive for data manipulations. This seemed particularly true for Virginia and Maryland, both of which list El Salvadorians (who presumably arrived by aircraft) as their largest immigrant populations instead of Mexicans, the most common largest immigrant population among the 50 states.

That immigrants overstaying their work visas make up a majority of non-legal residents in the United States is a little known fact after all the publicity surrounding illegal border crossings from Mexico on the southern border.[7,8] It is not clear why large populations of visa-immigrants, including immigrants who are in the U.S. illegally with overstayed work visas, might be preferred by fraudsters in death rate manipulations over non-visa'd immigrants who either crossed into the United States illegally through the Mexican and Canadian borders or, as has been widely reported especially for Chinese and Indian illegal immigrants, arrived in ports hiding on container ships.[8]  Maybe the visa status makes it much easier to incorrectly include this

17

subgroup in over-inflated population counts even after the visa has expired, while at the same time the visa status makes it easier to exclude the deaths of this subgroup (inaccurately) and then claim later, if caught, that it was an honest mistake anybody could make: To incorrectly assume an immigrant has overstayed the visa and is no longer to be counted as a legal resident in death counts.  Either way it is clear this general line of thinking is promising for explaining and predicting excess death rates reported by the United States and possibly other countries of the world in 2020 and 2021 and deserves further inquiry.

## The bigger picture

It was proposed long before 2020 that the 16th Amendment to the United States Constitution was the root of all evil throughout the world, not just in the U.S., allowing illegally collected federal income tax money from unprotected U.S. citizens to subsidize dysfunctional governments around the world through trade imbalances with the U.S. in unsustainable models of supposedly efficient and peaceful self-governing.[9]  For example, while the praises of the efficiency of the Swedish government are heard around the world, there would be little doubt in the minds of the Framers of the U.S. Constitution that the Swedish government could not survive long without the $5-$10 billion trade imbalance it has enjoyed with the United States yearly since 2000.[10]

The fundamental laws of efficient and peaceful self-governing, as laid out for the first time in history in the original U.S. Constitution, are like fundamental laws of physics: The Wright Brothers could not make a plane fly by changing the fundamental laws of physics any more than humans can live together in peace by changing the fundamental laws of peaceful self-governing.

The Covid-19 fake pandemic is just a symptom of a much bigger problem:  How are we going to get from here (unsustainable taxing scenarios by national governments around the world) to there (inevitable, sustained world peace where the fundamental human right of *no taxation without representation* is fully protected in all countries) in the fastest, most efficient, and least deadly way possible?  That is the question that needs to be asked right now as a result of the work reported in this article, not questions with what will be obvious answers even for schoolchildren in history class a few years from now about whether Covid-19 was a fake pandemic.

## References

1. Adam, D. The pandemic's true death toll: millions more than official counts. *Nature* 601, 312-315 (2022). https://www.nature.com/articles/d41586-022-00104-8

2. Keating, D., Cha, A.E., Florit, G. 'I just pray God will help me': Racial, ethnic minorities reel from higher covid-19 death rates. *Washington Post* (Nov. 20, 2020). https://www.washingtonpost.com/graphics/2020/health/covid-race-mortality-rate/?tid=ss_tw

3. American Community Survey. United States Census Bureau. https://www.census.gov/history/www/programs/demographic/american_community_survey.html

4. Social Security Numbers: Federal and State Laws Restrict Use of SSNs, yet Gaps Remain (15-SEP-05, GAO-05-1016T). United States Government Accountability Office. https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-05-1016T/html/GAOREPORTS-GAO-05-1016T.htm

5. GN 03315.010: Disclosing a Deceased Individual's Information. United States Social Security Administration. https://secure.ssa.gov/POMS.nsf/lnx/0203315010

6. Fiscella, K., Fremont, A.M. Use of Geocoding and Surname Analysis to Estimate Race and Ethnicity. Health Serv Res. 2006 Aug; 41(4 Pt 1): 1482–1500. doi: 10.1111/j.1475-6773.2006.00551.

7.  Gonzales, R. For 7th Consecutive Year, Visa Overstays Exceeded Illegal Border Crossings, National Public Radio, January 16, 2019 https://www.npr.org/2019/01/16/686056668/for-seventh-consecutive-year-visa-ov erstays-exceeded-illegal-border-crossings

8.  Fiscal Year 2019 Entry/Exit Overstay Report. United States Department of Homeland Security. March 30, 2020. (PDF file available from the author's drive at https://drive.google.com/file/d/10eVUZu3UO8YsuILqoGsJ5F-Ua1v66Por/view?usp=sharing)

9.  Young, H.N., Understanding the Great Dred Scott Fraud of 1857 Helps Restore the Supreme Court's Full Authority to Strike Down the 16th Amendment as Unconstitutional | Rights for Families. https://rights4families.wordpress.com/2020/04/20/understanding-the-great-dred-s cott-fraud-of-1857-helps-restore-the-supreme-courts-full-authority-to-strike-down -the-16th-amendment-as-unconstitutional/

10. Trade in goods with Sweden. United States Census Bureau. https://www.census.gov/foreign-trade/balance/c4010.html

Table 1:  Calculated death rates using Equation 1 compared with reported death rates for all 50 states for the 2010 census year.  The states are listed in order of largest negative difference to largest positive difference when the reported death rate was subtracted from the calculated death rate.

| State | Reported death rate (%)* | Latino population rate (%)** | Chinese population rate (%)*** | Indian population rate (%)*** | Lat+Chi+In population rates (%)**** | Calculated rate (Equation 1 applied)**** | Difference (calculated rate - reported rate) (%)**** |
|---|---|---|---|---|---|---|---|
| West Virginia | 1.15 | 1.20 | 0.17 | 0.21 | 1.59 | 0.98 | -0.16 |
| New Mexico | 0.77 | 46.30 | 0.37 | 0.28 | 46.95 (36.25) | 0.53 (0.64) | -0.24 (-0.14) |
| Florida | 0.92 | 22.50 | 0.50 | 0.81 | 23.81 (17.31) | 0.76 (0.83) | -0.16 (-0.10) |
| Oklahoma | 0.97 | 8.90 | 0.31 | 0.38 | 9.59 | 0.90 | -0.07 |
| Arkansas | 0.99 | 6.40 | 0.22 | 0.27 | 6.89 | 0.93 | -0.06 |
| California | 0.63 | 37.60 | 3.90 | 1.58 | 43.08 | 0.57 | -0.06 |
| Texas | 0.66 | 37.60 | 0.73 | 1.07 | 39.40 | 0.61 | -0.06 |
| Pennsylvania | 0.98 | 5.70 | 0.76 | 0.89 | 7.35 | 0.93 | -0.05 |
| Alabama | 1.01 | 3.90 | 0.23 | 0.31 | 4.45 | 0.96 | -0.05 |
| Rhode Island | 0.91 | 12.40 | 0.78 | 0.54 | 13.72 | 0.86 | -0.05 |
| Arizona | 0.73 | 29.60 | 0.66 | 0.63 | 30.90 | 0.69 | -0.04 |
| New Jersey | 0.79 | 17.70 | 1.70 | 3.54 | 22.94 | 0.77 | -0.02 |
| Nevada | 0.73 | 26.50 | 1.46 | 0.53 | 28.49 | 0.72 | -0.01 |
| Mississippi | 0.98 | 2.70 | 0.18 | 0.22 | 3.10 | 0.97 | -0.01 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Kentucky | 0.97 | 3.10 | 0.24 | 0.33 | 3.67 | 0.96 | 0.00 |
| Tennessee | 0.94 | 4.60 | 0.29 | 0.42 | 5.31 | 0.95 | 0.01 |
| Ohio | 0.94 | 3.10 | 0.44 | 0.62 | 4.16 | 0.96 | 0.02 |
| New York | 0.76 | 17.60 | 3.18 | 1.90 | 22.68 | 0.77 | 0.02 |
| Maine | 0.96 | 1.30 | 0.33 | 0.18 | 1.81 | 0.98 | 0.02 |
| Kansas | 0.86 | 10.50 | 0.47 | 0.55 | 11.52 | 0.88 | 0.03 |
| Iowa | 0.91 | 5.00 | 0.38 | 0.41 | 5.79 | 0.94 | 0.03 |
| Missouri | 0.92 | 3.50 | 0.43 | 0.44 | 4.37 | 0.96 | 0.03 |
| Oregon | 0.83 | 11.70 | 1.08 | 0.53 | 13.31 | 0.87 | 0.03 |
| Illinois | 0.78 | 15.80 | 0.93 | 1.59 | 18.32 | 0.82 | 0.04 |
| Delaware | 0.86 | 8.20 | 0.78 | 1.37 | 10.36 | 0.90 | 0.04 |
| Connecticut | 0.80 | 13.40 | 1.0 | 1.42 | 15.84 | 0.84 | 0.04 |
| Michigan | 0.89 | 4.40 | 0.52 | 0.86 | 5.78 | 0.94 | 0.05 |
| South Carolina | 0.90 | 5.10 | 0.25 | 0.39 | 5.74 | 0.94 | 0.04 |
| Louisiana | 0.90 | 4.20 | 0.26 | 0.29 | 4.75 | 0.95 | 0.06 |
| Indiana | 0.88 | 6.00 | 0.40 | 0.48 | 6.88 | 0.93 | 0.06 |
| Hawaii | 0.71 | 8.90 | 14.68 | 0.35 | 23.93 | 0.76 | 0.05 |
| Montana | 0.89 | 2.90 | 0.19 | 0.09 | 3.19 | 0.97 | 0.08 |
| Massachusetts | 0.80 | 9.60 | 2.09 | 1.30 | 13.00 | 0.87 | 0.07 |
| Nebraska | 0.83 | 9.20 | 0.31 | 0.37 | 9.88 | 0.90 | 0.07 |
| North Carolina | 0.83 | 8.40 | 0.43 | 0.67 | 9.50 | 0.91 | 0.08 |
| North Dakota | 0.88 | 2.00 | 0.26 | 0.26 | 2.52 | 0.97 | 0.09 |
| Wisconsin | 0.83 | 5.90 | 0.37 | 0.46 | 6.73 | 0.93 | 0.10 |
| South Dakota | 0.87 | 2.70 | 0.19 | 0.18 | 3.07 | 0.97 | 0.10 |
| Vermont | 0.86 | 1.50 | 0.45 | 0.28 | 2.23 | 0.98 | 0.12 |
| Wyoming | 0.79 | 8.90 | 0.24 | 0.13 | 9.27 | 0.91 | 0.12 |
| Washington | 0.72 | 11.20 | 1.80 | 1.03 | 14.02 | 0.86 | 0.14 |
| Maryland | 0.75 | 8.20 | 1.38 | 1.54 | 11.12 | 0.89 | 0.14 |
| Idaho | 0.73 | 11.20 | 0.35 | 0.18 | 11.73 | 0.88 | 0.15 |
| Colorado | 0.63 | 20.70 | 0.66 | 0.48 | 21.84 | 0.78 | 0.16 |
| Virginia | 0.74 | 7.90 | 0.91 | 1.43 | 10.24 | 0.90 | 0.16 |
| Georgia | 0.74 | 8.80 | 0.56 | 1.09 | 10.45 | 0.90 | 0.16 |
| New Hampshire | 0.77 | 2.80 | 0.58 | 0.69 | 4.07 | 0.96 | 0.18 |
| Minnesota | 0.73 | 4.70 | 0.57 | 0.72 | 5.98 | 0.94 | 0.21 |
| Utah | 0.53 | 13.00 | 0.59 | 0.27 | 13.87 | 0.86 | 0.33 |
| Alaska | 0.52 | 5.50 | 0.52 | 0.27 | 6.29 | 0.94 | 0.41 |

* 2010 crude death rates obtained from CDC Wonder. http://wonder.cdc.gov/  February, 2022.

** 2010 Latino population rates were initially obtained from a convenient table at the Wikipedia page titled "List of U.S. states by Hispanic and Latino population" https://en.wikipedia.org/wiki/List_of_U.S._states_by_Hispanic_and_Latino_population and then were later

21

confirmed to be accurate by checking with the referenced U.S. Census Bureau tables.

***2010 Chinese and Indian population rates were initially obtained from a convenient table at the Wikipedia page titled "Demographics of Asian Americans" https://en.wikipedia.org/wiki/Demographics_of_Asian_Americans and then were later confirmed to be accurate by checking with the referenced U.S. Census Bureau tables.

****Numbers in parentheses are the calculated death rates for Florida and New Mexico after the Cuban population rate of 6.5% and the Native American population rate of 10.7% were subtracted fom the Latino population rates for Florida and New Mexico, respectively, as described in the text.